**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STATE FARM GUARANTY INS. CO.**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **TRI-COUNTY CHIROPRACTIC & REHABILITATION CENTER, P.C.**, *et al.*, <br><br> **Defendants.** | **Civil Action No. 22-4852 (ES) (CLW)** <br><br> **OPINION** |

**SALAS, DISTRICT JUDGE**

Plaintiffs State Farm Guaranty Insurance Company and State Farm Indemnity Company (together "Plaintiffs" or "State Farm") filed suit against Defendants Tri-County Chiropractic and Rehabilitation Center, P.C. ("Tri-County"), Robert Matturro, D.C. ("Dr. Robert Matturro"), Advanced Spine and Pain Management, L.L.C. ("Advanced Spine"), Varinder Dhillon, M.D. ("Dr. Dhillon"), Nicholas Rosania, D.C. ("Dr. Rosania"), Bloomfield UAI, L.L.C. ("Bloomfield"), Dov Rand, M.D. ("Dr. Rand"), Primary Medical Services, L.L.C. ("Primary Medical"), Louis J. Citarelli, M.D. ("Dr. Citarelli"), Chiro Health Center, P.C. ("Chiro Health"), Marc Matturro, D.C. ("Dr. Marc Matturro"), and Marco Tartaglia, M.D. ("Dr. Tartaglia") (together "Defendants") bringing claims for (i) common law fraud (Count I); (ii) violations of the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1, *et seq.* (Count II); (iii) aiding and abetting fraud (Count III); (iv) unjust enrichment (Count IV); and (v) a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201–02 (Count V).  (D.E. No. 1 ("Complaint" or "Compl.") ¶¶ 288–311).  Before the Court is Defendants' motion to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  (D.E. No. 9).  Having considered the parties' submissions, the

Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Defendants' motion is **GRANTED-in-part** and **DENIED-in-part.**

## I.     BACKGROUND

### A.     Factual Background

Plaintiffs are insurance companies that underwrite automobile insurance in New Jersey. (Compl. ¶ 27). Defendants are medical professionals and health care entities that treat, among others, patients suffering from injuries sustained in automobile accidents. (*Id.* ¶¶ 12–26 & 62). Plaintiffs allege that Defendants engaged in a scheme—starting in 2014 and continuing today—to obtain money from Plaintiffs by submitting fraudulent bills and supporting documentation for services purportedly provided to patients who have been in automobile accidents and are eligible for personal injury protection ("PIP") benefits under Plaintiffs' indemnity policies. (*Id.* ¶¶ 1 & 6).

According to the Complaint, this scheme involved a number of illegal activities. *First*, Plaintiffs allege that Defendants submitted for PIP reimbursement fraudulent bills and supporting documentation for services that were either never performed or not medically necessary. (*Id.* ¶¶ 1–3). Rather, according to the Complaint, the services were performed according to a predetermined treatment protocol "designed and carried out to enrich Defendants by exploiting the patients' eligibility for PIP benefits, and not to address the unique circumstances and needs of any individual patient." (*Id.* ¶ 1). *Second*, the Complaint alleges that Defendants' corporate structure and ownership was unlawful. More specifically, Plaintiffs claim that Defendants Advanced Spine, Bloomfield, and Primary Medical were illegally owned and controlled by Defendant Dr. Rosania, a chiropractor, despite the fact that New Jersey law prohibits chiropractors from (i) employing or controlling the practices of physicians or (ii) owning healthcare practices that provide medical diagnostic tests. (*Id.* ¶¶ 220–265). *Third*, according to the Complaint, Defendants engaged in

unlawful relationships with one another, which included illegal self-referrals and kickbacks.  (*Id.* ¶¶ 266–82).  In particular, Plaintiffs allege that Defendants Advanced Spine, Bloomfield, and Primary Medical—through their true owner and controller, Dr. Rosania—entered into a secret scheme with Defendants Dr. Robert Matturro and Dr. Marc Matturro whereby Advanced Spine, Bloomfield and Primary Medical through Dr. Rosania agreed to pay kickbacks to Dr. Robert Matturro and Dr. Marc Matturro in exchange for patient referrals.  (*Id.* ¶ 268).  Pursuant to this scheme, Advanced Spine, Bloomfield, and Primary Medical, allegedly gained access to Dr. Robert Matturro and Dr. Marc Matturro's offices by paying kickbacks to those doctors disguised as fees to lease office space in exchange for access to patients.  (*Id.* ¶¶ 271–72).  *Fourth*, Plaintiffs claim that because Defendants had a corporate structure and ownership that was unlawful and engaged in unlawful self-referrals and kickbacks, they falsely represented to Plaintiffs that they were in compliance with pertinent healthcare laws and were eligible to receive PIP benefits in the first instance.  (*Id.* ¶¶ 42–55 & 220–82).

### B.      Procedural History

Plaintiffs initiated this action against Defendants on August 1, 2022, bringing claims for (i) common law fraud against all Defendants (Count I); (ii) violations of IFPA against all Defendants (Count II); (iii) aiding and abetting fraud against Dr. Robert Matturro, Dr. Marc Matturro, Tri-County, and Chiro Health (Count III); (iv) unjust enrichment against all Defendants (Count IV); and (v) a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201–02 against all Defendants (Count V).  (*Id.* ¶¶ 288–311).  On October 7, 2022, Defendants moved to dismiss the Complaint in its entirety.  (D.E. No. 9; D.E. No. 9-2 ("Mov. Br.")).  *First*, Defendants move to dismiss Plaintiffs' claims for common law fraud (Count I), aiding and abetting fraud (Count III), unjust enrichment (Count IV), and a Declaratory Judgment (Count V) under Rule 12(b)(1) in favor

of arbitration.  (Mov. Br. at 11–14).  *Second*, Defendants move to dismiss Plaintiffs' IFPA claim

(Count II) under Rule 12(b)(6) for failure to state a claim.  (*Id.* at 14–20).  On November 7, 2022,

Plaintiffs filed an opposition.  (D.E. No. 13 ("Opp. Br.")).

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(1) Standard

The Court can adjudicate a dispute only if it has subject matter jurisdiction to hear the

asserted claims.  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  "Rule 12(b)(1)

governs jurisdictional challenges to a complaint."  *Otto v. Wells Fargo Bank, N.A.*, No. 15-8240,

2016 WL 8677313, at *2 (D.N.J. July 15, 2016).  "When a motion under Rule 12 is based on more

than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss

the complaint for lack of subject matter jurisdiction, all other defenses and objections become

moot."  *Dickerson v. Bank of Am., N.A.*, No. 12-3922, 2013 WL 1163483, at *1 (D.N.J. Mar. 19,

2013) (quoting *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993)).

In deciding a 12(b)(1) motion, "a court must first determine whether the party presents a

facial or factual attack because the distinction determines how the pleading is reviewed."

*Leadbeater v. JPMorgan Chase, N.A.*, No. 16-7655, 2017 WL 4790384, at *3 (D.N.J. Oct. 24,

2017).  "When a party moves to dismiss prior to answering the complaint . . . the motion is

generally considered a facial attack."  *Id.*  In reviewing a facial attack, the Court should consider

only the allegations in the complaint, along with documents referenced therein and attached

thereto, in the light most favorable to the nonmoving party.  *See Const. Party of Pennsylvania v.*

*Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (providing that a facial challenge "considers a claim on

its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court

because, for example, it does not present a question of federal law").  Thus, the motion is handled

much like a 12(b)(6) motion, and allegations in the complaint should be accepted as true. *Leadbeater*, 2017 WL 4790384, at *3.

### B.    Rule 12(b)(6) Standard

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id*. at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While the Court generally "may not consider matters extraneous to the pleadings" when deciding a Rule 12(b)(6) motion, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), an exception to this general rule provides that the Court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that pursuant to Rule 12(b)(6) the Court "may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record

of the case.'") (first citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); and then quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).  Thus, a court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Fuller v. Rozlin Fin. Grp., Inc.*, No. 19-20608, 2020 WL 5036215, at *2 (D.N.J. Aug. 26, 2020) (quoting *Clemons v. Midland Credit Mgmt., Inc.*, No. 18-16883, 2019 WL 3336421, at *2 n.1 (D.N.J. July 25, 2019)).

### C.      Rule 9(b) Heightened Pleading Standard

Where pleading fraud, the plaintiff "must meet a heightened pleading standard under [Rule] 9(b)." *Zuniga v. Am. Home Mortg.*, No 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). Rule 9(b) states that when "alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  "In order to satisfy Rule 9(b), a complaint must provide all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (internal quotation marks omitted).  But plaintiffs "need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)).

## III.    DISCUSSION

### A.      Counts I, III, and IV

Under the New Jersey Automobile Reparation Reform Act ("No Fault Law"), automobile insurers are mandated to provide PIP benefits to insureds that are involved in automobile accidents. *See* N.J.S.A. § 39:6A-1 *et seq.* (the "No-Fault Law").  When an insured receives treatment, he or she is permitted to assign his or her right to PIP benefits to healthcare providers for payment of the treatment rendered.  *See* N.J.S.A. § 39:6A-4.  Providers can submit claims seeking payment for reasonable, necessary, and appropriate treatments.  *See id.*  Further, to be eligible for PIP benefits, providers must comply with all relevant laws and regulations governing healthcare in the State of New Jersey.  *See, e.g., Allstate Ins. Co. v. Orthopedic Evaluations, Inc.*, 693 A.2d 500, 503 (N.J. Super. Ct. App. Div. 1997).

Defendants move to dismiss Counts I, III, IV, and V under Rule 12(b)(1) because they contend that these claims are subject to arbitration.  (Mov. Br. at 11–14).[1]  More specifically, Defendants argue that these Counts fall within the ambit of the No-Fault Law's arbitration mandate, which provides that "dispute[s] regarding the recovery of [PIP] benefits . . . arising out of the operation, ownership, maintenance, or use of an automobile may be submitted to dispute resolution on the initiative of any party to the dispute."  N.J.S.A. § 39:6A-5.1(a); (Mov. Br. at 11). Relying heavily on the decision rendered by the Honorable Michael A. Shipp, U.S.D.J., in *Government Employees Insurance Co. v. Elkholy*, No. 21-16255, 2022 WL 2373917 (D.N.J. June 30, 2022), Defendants contend that Counts I, III, IV, and V amount to disputes regarding the recovery of PIP benefits, which must be arbitrated.  (Mov. Br. at 11–14).  In opposition, Plaintiffs argue that Counts I, III, IV, and V are not subject to arbitration under the No-Fault Law because

---

[1]      Though Defendants appear to argue that Counts I, III, IV, and V should be dismissed under Rule 12(b)(1) because these claims are subject to arbitration, other portions of their moving brief appear to suggest that such claims should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(6).  (*See, e.g.,* Mov. Br. at 12). However, because Defendants' challenge under Rule 12(b)(1) raises only a facial attack to subject matter jurisdiction based on the No-Fault Law's arbitration mandate, the standard of review that the Court would employ under either Rule is the same.  *See Leadbeater*, 2017 WL 4790384, at *3.

those claims go beyond the type of disputes for which arbitration is mandatory.  (Opp. Br. at 25–28).  For the reasons set forth below, the Court agrees with Defendants and dismisses Counts I, III, and IV in favor of arbitration.[2]

In 1972, the New Jersey Legislature adopted the New Jersey Automobile Reparation Reform Act ("No-Fault Law"), which mandated that automobile insurers provide PIP benefits to motorists involved in automobile accidents.  *Johnson v. Roselle EZ Quick, LLC*, 143 A.3d 254, 261 (N.J. 2016).  One of the objectives of the No-Fault Law was to "minimize the workload placed upon the courts by enabling losses to pass into claims . . . with a minimum of judicial intermediation."  *Elkholy*, 2022 WL 2373917, at *2 (citing *Gambino v. Royal Globe Ins. Cos.*, 429 A.2d 1039, 1042 (N.J. 1981)).  To that end, the No-Fault Law provides as follows:

> Any dispute regarding the recovery of medical expense benefits or other benefits provided under personal injury protection coverage . . . arising out of the operation, ownership, maintenance or use of an automobile may be submitted to dispute resolution on the initiative of any party to the dispute, as hereinafter provided.

N.J.S.A. § 39:6A-5.1(a).  New Jersey courts have interpreted this provision to mean that, where either party elects arbitration, "any dispute" concerning payment of PIP benefits must be submitted to binding arbitration.  *See* N.J.S.A. 39:6A–5.1(a); *see also Boyd v. Plymouth Rock Assur. Corp.*, No. A-1379-12T1, 2013 WL 2300950, at *3 (N.J. Super. Ct. App. Div. May 28, 2013) ("[T]he word 'may' in N.J.S.A. 39:6A–5.1(a) was intended to give either party an absolute right to require that a PIP dispute be submitted to arbitration."); *State Farm Mut. Auto. Ins. Co. v. Molino*, 674 A.2d 189, 191 (N.J. Super. Ct. App. Div. 1996) (noting that the word "dispute" in the statute is unqualified).  Further, "the term 'dispute' refers to legal disputes between parties" and therefore "'any dispute' . . . means all 'disputes' around the 'recovery' of PIP Benefits are controlled under

---

[2]     The Court addresses Plaintiffs' claim for a Declaratory Judgment (Count V) separately, below.

this provision." *Elkholy*, 2022 WL 2373917, at *6 (citing N.J.S.A. § 39:6A-5.1(a)); *Molino*, 674 A.2d at 190.   As to the term "recovery," "the policy behind the No-Fault Law suggests that recovery means claims for PIP Benefits submitted by insured individuals or their medical providers to insurance companies." *Elkholy*, 2022 WL 2373917, at *6.   The arbitration mandate covers a broad array of legal disputes, including, in relevant part, (i) "whether the treatment or health care service which is the subject of the dispute resolution proceeding is in accordance with the provisions of [this Act] or the terms of the policy;" (ii) "eligibility of the treatment or service for compensation;" (iii) "eligibility of the provider performing the treatment or service to be compensated under the terms of the policy or under regulations promulgated by the commissioner;" (iv) "whether the disputed medical treatment was actually performed;" (v) "the necessity or appropriateness of consultations by other health care providers;" (vi) "disputes involving application of and adherence to fee schedules;" and (vii) "whether the treatment performed is reasonable, necessary, and compatible with the protocols provided."   N.J.S.A. § 39:6A-5.1(c).

The purpose of the No-Fault Law's arbitration provision is a "firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process."  *Molino*, 674 A.2d at 191; *see Roig v. Kelsey,* 641 A.2d 248, 256 (1994) (noting that the reduction of court congestion is one of "the overwhelming goals" of the no-fault scheme).   As such, New Jersey courts have held that the statute mandating PIP arbitration must be read "broadly" and that "arbitrators are authorized to determine both factual and legal issues," *State Farm Ins. Co. v. Sabato*, 767 A.2d 485, 487 (2001) (citing *Molino*, 674 A.2d at 191), including whether a medical provider's claims should be "disqualified for fraud."  *Gov't Emps. Ins. Co v. Tri Cnty. Neurology & Rehab. LLC*, 721 F. App'x 118, 122 (3d Cir. 2018) (citing *Sabato*, 767 A.2d at 486–87).   In fact, the Appellate

9

Division in *Sabato* stressed the statutory directive to arbitrate PIP disputes and cautioned courts against countenancing end-runs around the statutory scheme, stating that "[c]arriers should not be empowered to avoid arbitration simply by characterizing PIP disputes as questions of 'entitlement' or 'coverage' and then seeking judicial resolution of those issues." *Sabato*, 767 A.2d at 487 (citing *Molino*, 674 A.2d at 191).

Multiple courts in this District have held that fraud-based claims arising from PIP-related insurance fraud schemes are not subject to arbitration because such allegations "go beyond" the type of routine PIP disputes for which arbitration is mandatory under the No-Fault Law. *See, e.g., Gov't Emps. Ins. Co. v. Reg'l Orthopedic Pro. Ass'n*, No. 17-1615, 2017 WL 5986964, at *1 (D.N.J. Dec. 1, 2017); *Gov't Emps. Ins. Co. v. Adams Chiropractic Ctr. P.C.*, No. 19-20633, 2020 WL 881514, at *1 n.3 (D.N.J. Feb. 24, 2020) ("[I]t is well-established that NJIFPA, RICO or common law fraud claims are not subject to mandatory arbitration under New Jersey's no-fault insurance statute . . . "). However, the Honorable Michael A. Shipp, U.S.D.J. and the Honorable Brian R. Martinotti, U.S.D.J. recently reached different conclusions. *See Elkholy*, 2022 WL 2373917, at *6–7; *Gov't Emps. Ins. Co. v. Caring Pain Mgmt. PC*, No. 22-5017, 2023 WL 3749984, at * 6–7 (D.N.J. May 31, 2023). After considering the plain language of the No-Fault Law—which demonstrated an intent to "encompass[] a broad array of legal disputes regarding PIP benefits," the New Jersey Appellate Division cases interpreting the law, and the purpose behind the law which evidenced a "firm policy favoring prompt and efficient resolution . . . without resort to the judicial process"—the courts in *Elkholy* and *Caring Pain Management* concluded that plaintiffs' RICO, common law fraud, and unjust enrichment claims were subject to arbitration under the No-Fault Law. *Elkholy*, 2022 WL 2373917 at *6–7; *Caring Pain Mgmt.*, 2023 WL 3749984, at * 6–7. Neither court was convinced by the plaintiffs' attempts to "dress their PIP

Benefits dispute in a different color sounding in fraud" nor were they persuaded that fraud-based claims "warrant special treatment or should be carved out from mandatory arbitration . . . ." *Elkholy*, 2022 WL 2373917, at *6–7; *Caring Pain Mgmt.*, 2023 WL 3749984, at * 6–7.  For the reasons set forth below, the Court agrees with the reasoning employed by the courts in *Elkholy* and *Caring Pain Management* and dismisses Counts I, III, and IV in favor of arbitration.

Starting first with the plain language of the No-Fault Law's arbitration provision, as well as the New Jersey Appellate Division's decisions in *Molino* and *Sabato* interpreting that provision, the Court finds that Plaintiffs' common law fraud, aiding and abetting fraud, and unjust enrichment claims fall within the purview of the statute's arbitration provision.  As in *Elkholy* and *Caring Pain Management* these claims involve (i) a dispute by Plaintiffs (ii) involving Defendants' recovery of PIP benefits that (iii) one party—Defendants—wishes to send to arbitration.  *Elkholy*, 2022 WL 2373917, at *6; *Caring Pain Mgmt.*, 2023 WL 3749984, at * 6.  And as stated above, the Appellate Division in *Molino*, emphasized that the word "dispute" in the No-Fault Law's arbitration provision is unqualified.  *Molino*, 674 A.2d at 191.  Further, many of Plaintiffs' grievances mirror the types of disputes explicitly covered by the arbitration mandate.  For example, the arbitration mandate covers a broad array of legal disputes, including, in relevant part, (i) "whether the treatment or health care service which is the subject of the dispute resolution proceeding is in accordance with the provisions of [this Act] or the terms of the policy;" (ii) "whether the disputed medical treatment was actually performed;" and (iii) "whether the treatment performed is reasonable, necessary, and compatible with the protocols provided."  N.J.S.A. § 39:6A-5.1(c).

Here, Plaintiffs allege that Defendants engaged in fraud based on these precise types of disputes.  More specifically, Plaintiffs allege that Defendants (i) falsely represented to Plaintiffs that they were in compliance with pertinent healthcare laws and were eligible to receive PIP

benefits when in fact they had a corporate structure and ownership that was unlawful and engaged in unlawful self-referrals and kickbacks; (ii) submitted for PIP reimbursement fraudulent bills and supporting documentation for services that were never performed; and (iii) submitted for PIP reimbursement fraudulent bills and supporting documentation for services that were not medically necessary. (Compl. ¶¶ 1–3, 42–55 & 220–82). And as the Court in *Elkholy* pointed out, "[i]t seems arbitrary to distinguish a scenario where medical providers inadvertently bill an insurance company for PIP benefits through unnecessary or unperformed medical procedures and a scenario where they fraudulently do so." *Elkholy*, 2022 WL 2373917, at *7. In fact, the Appellate Division in *Molino* emphasized that to the extent there is any ambiguity regarding what constitutes a "dispute" subject to the arbitration provision, the term must be construed liberally "to harmonize the arbitration provision with [New Jersey's] firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process." *Molino,* 674 A.2d at 191; *see also Sabato*, 767 A.2d at 487 (stating that the language of the statute mandating PIP arbitration must be "read as broadly as the words themselves indicate, that statutory arbitrators are authorized to determine both factual and legal issues, and that coverage issues are to be decided by the arbitrator in the same manner as issues dealing with the extent of injury and the amount of recovery."). As such, notwithstanding that Plaintiffs "seek to dress their PIP benefits dispute in a different color sounding in fraud, the Court adheres to substance over form." *Elkholy*, 2022 WL 2373917, at *6. Nothing in the plain text of the statute provides that fraud-based PIP benefits disputes should be carved out from mandatory arbitration. *See United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000) (concluding that "[o]nce the plain meaning of the statute is determined, it is conclusive 'except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458

U.S. 564, 571 (1982)).  As such, the Court finds that Plaintiffs' common law fraud, aiding and abetting fraud, and unjust enrichment claims fall within the purview of the statute's arbitration provision.

Though the plain meaning of the No-Fault Law's arbitration provision is conclusive in the Court's analysis, the purpose behind the No-Fault Law also supports the Court's conclusion in finding that Plaintiffs' common law fraud, aiding and abetting fraud, and unjust enrichment claims fall within the purview of the statute's arbitration provision.  As explained above, the purpose of the No-Fault Law's arbitration provision is a "firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process."  *Molino*, 674 A.2d at 191.  And New Jersey Courts have expressly cautioned courts against countenancing end-runs around the statutory scheme.  *Sabato*, 767 A.2d at 487.  As the Court in *Elkholy* noted,

> [S]hould the parties' characterization of a PIP Benefits dispute be dispositive, a party wishing to sidestep mandatory arbitration could classify their claims in ways that fling open the courthouse doors.  Such an end-run around the No-Fault Law's strong policy purpose of prompt and efficient resolution of PIP disputes without resort to the judicial process would be consequential, to say the least.

*Elkholy*, 2022 WL 2373917, at *6 (internal quotations and citation omitted).  The Court declines to countenance an end-run around the No-Fault Law's statutory scheme in favor of arbitration, particularly when nothing in the plain text of the No-Fault Law's arbitration provision indicates that it should do so.[3]

---

[3]     The Court acknowledges that, like the courts in *Elkholy* and *Caring Pain Mgmt.*, it rests its conclusion that Counts I, III, and IV fall under the purview of the No Fault Law's mandatory statutory arbitration provision on decisions issued by the state's appellate court. *Elkholy*, 2022 WL 2373917, at *6–7; *Caring Pain Mgmt.*, 2023 WL 3749984, at * 6–7.  Generally, when this Court must decide a claim involving matters of state law, it must "apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues" before the Court. *Gares v. Willingboro Twp.,* 90 F.3d 720, 725 (3d Cir.1996).  The parties' briefing and the Court's own research, however, revealed no decision by the New Jersey Supreme Court addressing the precise issue before this Court, that is, whether claims for (i) common law fraud, (ii) aiding and abetting fraud and (iii) unjust enrichment may be challenged outside of the No-Fault Law's statutory arbitration procedure.  The Third Circuit has stated that "[i]n the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Id.*  As such, the

Plaintiffs' arguments to the contrary are unavailing.  Plaintiffs argue that Counts I, III, and IV are not subject to arbitration under the No-Fault Law because those claims go beyond the type of disputes for which arbitration is mandatory.  (Opp. Br. at 25–28).  They point out that multiple courts in this District have held that fraud-based claims arising from PIP-related insurance fraud schemes are not subject to arbitration because such allegations "go beyond" the type of routine PIP disputes for which arbitration is mandatory under the No-Fault Law.  (*Id.*).  As such, Plaintiffs argue that these cases support resolving all of their claims in a single judicial proceeding.  (*Id.* at 28).  For the following reasons, the Court declines to follow the reasoning employed by these other courts.

To start, *Government Employees Insurance Co. v. Stelton Radiology Corp.,* cited by Plaintiffs in support, notes only that "RICO and other fraud claims 'go beyond' the type of PIP disputes for which arbitration is mandatory," without providing any additional clarification as to why those claims are not covered by the No-Fault Law's arbitration provision when considering the plain text or purpose of the provision.  No. 20-18532, 2022 WL 1486116, at *5 (D.N.J. May 11, 2022).  In another case, *Government Employees Insurance Co. v. Adams Chiropractic Center P.C.*, while the court concluded that "NJIFPA, RICO or common law fraud claims are not subject to mandatory arbitration under New Jersey's no-fault insurance statute" it cited only case law that discussed IFPA claims in reaching that conclusion.  No. 19-20633, 2020 WL 881514, at *1 n.3 (D.N.J. Feb. 24, 2020).  Likewise, in *Government Employees Insurance Co. v. Regional Orthopedic Professional Ass'n*, though the Court concluded that plaintiffs "IFPA, RICO, and other fraud-based claims are not subject to arbitration" and "go beyond" such disputes, it too cited only

---

New Jersey Appellate Division's decisions in *Molino*, 674 A.2d 189 and *Sabato*, 767 A.2d 485, "provide a strong indication that the state's Supreme Court would hold that the PIP statute compels arbitration of" Counts I, III, and IV. *Gov't Emps. Ins. Co. v. MLS Med. Grp. LLC*, No. 12-7281, 2013 WL 6384652, at *5 n.1 (D.N.J. Dec. 6, 2013).

to cases concerning the arbitrability of IFPA claims.  2017 WL 5986964, at *1 (citing to *Fed. Ins. Co. v. Von Windherburg-Cordeiro*, No. 12-2491, 2012 WL 6761877, at *4 (D.N.J. 2012) (concluding that IFPA claims are not arbitrable); *see also Nationwide Mut. Fire Ins. Co. v. Fiouris*, 928 A.2d 154, 157 (N.J. Super. Ct. App. Div. 2007) ("Our conclusion that Nationwide is entitled to a judicial resolution of its claim that Fiouris' policy is void due to his alleged misrepresentation of his state of residence is reinforced in the present case by the fact that Nationwide asserts its claim under the Insurance Fraud Prevention Act . . . .")).  Further, in *Citizens United Reciprocal Exchange v. Meer*, the Court did not hold that claims for common law fraud, aiding and abetting fraud, and unjust enrichment were not subject to statutory arbitration.  321 F. Supp. 3d 479 (D.N.J. 2018).  *Meer's* only discussion of mandatory arbitration under N.J.S.A. 39:6A-5.1(a) was its holding that the insurer's declaratory judgment claim, which sought a declaration that the plaintiff did not have to pay defendants' fraudulent pending claims, was subject to mandatory arbitration under N.J.S.A. 39:6A-5.1(a) and was thus dismissed.  *Id.* at 487–88.  As such, the Court does not find the reasoning of these courts persuasive in reaching a contrary conclusion.[4]

Finally, Plaintiffs cite to *Government Employees Insurance Co. v. J.D. D'Agostini*, where the court rejected defendants' argument that plaintiffs' IFPA, RICO, and other fraud-based claims were subject to PIP arbitration.  No. 17-6620 (D.N.J. Oct. 11, 2018) (D.E. Nos. 112 & 133).  There, the court reasoned that while claims that have not yet been paid must be arbitrated, cases for past

---

[4]     Plaintiffs also cite to *Allstate New Jersey Insurance Co. v. Cherry Hill Pain* & *Rehabilitation Institute*, 911 A.2d 493 (N.J. Super. Ct. App. Div. 2006) and *Allstate Insurance Co. v. Orthopedic Evaluations, Inc.*, 693 A.2d 500 (N.J. Super. Ct. App. Div. 1997) in arguing that New Jersey state courts have routinely adjudicated declaratory judgment claims in cases involving fraud and payment of PIP benefits.  (Opp. Br. at 27 n.22).  To start, neither of these courts specifically analyzed whether the claims at issue here fall within the ambit of the No-Fault Law's arbitration provision.  As such, they do not lead the Court to a contrary conclusion.  And in *Government Employees Insurance Co. v. Tri County Neurology & Rehabilitation LLC*, 721 F. App'x 118, 122–23 (3d Cir. 2018), the Third Circuit made clear that, based on the PIP arbitration statute and the New Jersey Appellate Division decisions interpreting it, plaintiff's declaratory judgment claim regarding fraudulent PIP benefits claims was subject to mandatory arbitration.

paid claims can go forward because "the nature of fraud is that there was misrepresentation made as to those claims, so those claims can go forward pursuant to the common law of the state statutes." No. 17-6620 (D.N.J. Oct. 11, 2018) (D.E. No. 133, Transcript of Hearing on Defendants' Motion to Compel Arbitration at 6:8–15 & 34:20–35:11). However, in specifying what disputes are subject to arbitration, the plain text of the No-Fault Law's arbitration provision makes no distinction between disputes for fraudulent PIP benefits that were already paid and those that are pending. It merely provides that "*[a]ny dispute* regarding the recovery of [PIP] benefits . . . arising out of the operation, ownership, maintenance, or use of an automobile may be submitted to dispute resolution on the initiative of any party to the dispute." N.J.S.A. § 39:6A-5.1(a) (emphasis added); *see also Molino*, 674 A.2d 189 (App. Div. 1996) (noting that the word "dispute" in the statute is unqualified). Like in *Elkholy*, the Court is not eager to engraft the word "pending" before "disputes" in the No-Fault Law's arbitration provision when the legislature chose not to do so. *See Elkholy*, 2022 WL 2373917, at *7; *Knoepfler v. Guardian Life Ins. Co. of Am.*, 438 F.3d 287, 297 (3d Cir. 2006) ("Under New Jersey law, [] "[w]e cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment."). This is particularly true where, as is the case here, any ambiguity of what constitutes a dispute subject to the arbitration provision must be construed liberally "to harmonize the arbitration provision with [New Jersey's] firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process." *Molino*, 674 A.2d at 191. As such, under the plain meaning of the No-Fault Law's arbitration provision and the Appellate Division's decisions in *Molino* and *Sabato* interpreting that provision, Plaintiffs' common law fraud, aiding and abetting fraud, and unjust enrichment claims do not avoid the No-Fault Law's arbitration mandate.[5]

---

[5]     Plaintiffs also cite to the court's decision in *Allstate Insurance Company v. Lopez*, 710 A.2d 1072, 1076–77 (Law. Div. 1998), in connection with its argument that Counts I, III, and IV are not subject to arbitration. (Opp. Br.

Having reviewed the No-Fault Law's "language, legislative intent, application, and arbitrable claims with [Plaintiffs'] claims for common law fraud, [aiding and abetting fraud] and unjust enrichment," this Court finds "nothing preventing an arbitrator from hearing them." *See Elkholy*, 2022 WL 2373917, at *7. As such, Defendants' motion is granted as to Plaintiffs' claims for common law fraud, aiding and abetting fraud, and unjust enrichment, and these claims are DISMISSED *without prejudice* in favor of arbitration.[6]

## B.   Count II

Defendants move to dismiss Plaintiffs' IFPA claim (Count II) arguing that Plaintiffs' claim is pled with insufficient particularity to satisfy the heightened pleading standard set forth by Rule 9(b) for fraud-based claims.[7] (Mov. Br. at 14–20). More specifically, Defendants argue that this claim should be dismissed because the Complaint (i) fails to allege claim-specific allegations of knowing misrepresentations as required under the IFPA and instead improperly relies on

---

at 27 n.23). *Lopez*, however, is distinguishable. *Lopez* involved a declaratory judgment action regarding PIP claims resulting from an insurance fraud scheme involving over 400 defendants. *Id.* The court granted the insurer's motion to stay trials and arbitration proceedings concerning the various PIP claims, given the massive nature of the fraud allegedly perpetrated by the insureds. *Id.* at 1073. However, in *Sabato* the Appellate Division acknowledged the uniquely large scope of the fraud in *Lopez*, but held that, in the ordinary course, disputes over allegedly fraudulent PIP claims should be resolved through arbitration. *Sabato*, 767 A.2d at 487. The instant case, which includes only twelve defendants "does not have the number of parties and case management complexities of *Lopez*" and as such is distinguishable. *Tri Cnty. Neurology & Rehab. LLC*, 721 F. App'x at 123 n.4. Further, *Sabato* also noted that the Appellate Division's decision in *Molino*, holding that PIP claims are subject to binding arbitration, must control over the Law Division's decision in *Lopez*. *Sabato*, 767 A.2d at 487; *see Molino*, 674 A.2d 191.

[6]    Defendants suggest that the State Farm Decision Point Review Plan ("DPR" Plan), which gives insurers oversight of the payment of PIP benefits to medical providers, contains a mandatory arbitration provision. (Mov. Br. at 7 & 20). The provision provides: "[u]nder State Farm's Conditional Assignment of Benefits, after exhausting the Internal Appeals process, a provider must submit any PIP dispute, as defined by N J.A.C. 11:35, to PIP Dispute Resolution in accordance with this Plan." (*Id.* at 7 (citing D.E. No. 9-1, Ex. B. to D.E. No. 9 at 7)). It is not clear that any of Plaintiffs' claims would even fall under this provision given that there is no indication that the providers have exhausted the Internal Appeals Process. However, because the Court finds that Plaintiffs' common law fraud, aiding and abetting fraud, and unjust enrichment claims fall within the No-Fault Law's mandatory arbitration provision, this Court need not address whether those claims also fall within DPR Plan's provision.

[7]    Defendants do not appear to argue that Plaintiffs' IFPA claim is subject to mandatory arbitration under the No-Fault Law. (Mov. Br. at 11). Regardless, other courts have held that the plain language, purpose, and provisions of IFPA demonstrate that IFPA claims must be brought before the court notwithstanding the No-Fault Law's arbitration provision. *Elkholy*, 2022 WL 2373917, at *10; *see also Caring Pain Mgmt.*, 2023 WL 3749984, at *8. And, as stated above, it is not clear that Plaintiffs' IFPA claim would fall under the DPR Plan's arbitration provision, since there is no indication that the providers have exhausted the Internal Appeals Process.

representative examples; (ii) fails to reveal that the treatment protocols followed by Defendants were mandated by Plaintiffs' own DPR Plan; (iii) does not provide any reference to expert analysis, literature, or statistically valid data in substantiating its claims; (iv) only generally alleges that improper self-referrals occurred; and (v) fails to allege what misrepresentations each doctor allegedly made.  (*Id.*).  Plaintiffs oppose, arguing that the Complaint alleges in detail numerous claims for PIP benefits that constitute IFPA violations.  (Opp. Br. at 15–24).  For the reasons set forth below, the Court agrees with Plaintiffs.

An individual or medical provider violates the IFPA if he or she engages in any of the following conduct:

> (1) Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 *et seq.*), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company, the Unsatisfied Claim and Judgment Fund or any claimant thereof in connection with, or in support of or opposition to any claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

N.J.S.A. § 17:33A-4(1)–(3).  In other words, the IFPA "prohibits the submission of insurance reimbursement claims when a party knows that the claim contains false or misleading information concerning any fact or thing material to the claim, and prohibits concealment or knowing failure

to disclose an event that affects the eligibility for reimbursement or the amount of reimbursement." *Stelton Radiology Corp.*, 2022 WL 1486116, at *8.

To allege a claim under the IFPA, "[a] [p]laintiff must essentially [allege] (1) knowledge, (2) falsity, and (3) materiality." *Horizon Blue Cross Blue Shield of New Jersey v. Focus Express Mail Pharmacy, Inc.*, No. 17-0571, 2017 WL 3588195, at *4 (D.N.J. Aug. 17, 2017) (internal quotation and citation omitted). First, "[t]he knowledge prong may be fulfilled when a defendant knowingly submits a false bill or statement." *Id.* (citing *Va. Sur. Co. v. Macedo*, No. 08–5586, 2011 WL 1769858, at *16 (D.N.J. May 6, 2011)). Second, a false bill or misleading statement constitutes a false statement under the IFPA and fulfills the falsity requirement. *Id.* (citing *Va. Sur. Co.*, 2011 WL 1769858, at *16). Third, under the materiality prong, "[a]n insured's misstatement is material if[,] when made[,] a reasonable insurer would have considered the [mis]represented fact relevant to its concerns and important in determining its course of action." *Id.* at *5 (quoting *Horizon Blue Cross Blue Shield of N.J. v. Transitions Recovery Program*, No. 10–3197, 2015 WL 8345537, at *4 (D.N.J. Dec. 8, 2015)).

Because the IFPA "sweeps more broadly than common law fraud," it "does not require proof of reliance on the false statement or resultant damages, nor proof of intent to deceive." *Meer*, 321 F. Supp. 3d at 492–93 (quoting *Lincoln Nat'l Life Ins. Co. v. Schwarz*, No. 09-3361, 2010 WL 3283550, at *16 (D.N.J. Aug. 18, 2010)); *see also Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1247 (2006). A plaintiff need only allege that (i) the defendant presented false or misleading information in connection with submitting an insurance claim; (ii) the defendant knew the information was false or misleading; and (iii) the information was material to a claim for reimbursement under an insurance policy. *Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Horizon Blue Cross Blue Shield of New Jersey*, No. 21-10991, 2022 WL 4354654, at *7

(D.N.J. Sept. 20, 2022) (citing *LM Ins. Corp. v. All-Ply Roofing Co.*, No. 14-4723, 2019 WL 366554, at *12 (D.N.J. Jan. 30, 2019)).

Here, Plaintiffs argue that the Complaint alleges in detail numerous claims for PIP benefits that constitute IFPA violations, including Defendants' false billing for medically unnecessary services or for services that were never performed, unlawful corporate structure and ownership, unlawful relationships with one another that involved self-referrals and kickbacks, and overall failure to comply with all applicable statutory and regulatory requirements governing the provision of healthcare services in the State of New Jersey.  (Opp. Br. at 15–16 (citing Compl. ¶¶ 30, 42, 44 & 45)).  Defendants argue that this claim should be dismissed because the Complaint (i) fails to allege claim-specific allegations of knowing misrepresentations as required under the IFPA and instead improperly relies on representative examples; (ii) fails to reveal that the treatment protocols followed by Defendants were mandated by Plaintiffs' own DPR Plan; (iii) does not provide any reference to expert analysis, literature, or statistically valid data in substantiating their claims; (iv) only generally alleges that improper self-referrals occurred; and (v) fails to allege what misrepresentations each doctor allegedly made.  (Mov. Br. at 14–20).  The Court will address each of Defendants' arguments in favor of dismissal in turn.

*First*, with respect to Plaintiffs' IFPA claim based on Defendants' alleged fraudulent treatment and billing protocols, Defendants argue that the Complaint has failed to bring forth claim-specific allegations of knowing material misrepresentations as required under the law and has failed to allege any facts regarding specific misrepresentations made in claims submitted to Plaintiffs, the basis of the claimant's knowledge of their falsity, or who made the alleged misrepresentation.  (Mov. Br. at 15–16 & 19–20).  The Court disagrees.

20

To start, Plaintiffs have alleged ample details of the who, what, when, where, and how of the fraudulent scheme to state a claim for violations of the IFPA.  The Complaint contains extensive factual allegations detailing Defendants' (i) fraudulent initial evaluations that reported the same findings for all patients to justify a predetermined, non-individualized course of treatment that was unnecessary, regardless of the unique characteristics of each patient; (ii) unlawful billing for medically unnecessary services and misrepresentations regarding the medical necessity of services provided; and (iii) fraudulent billing for services that were never performed, all of which were designed to maximize compensation to the Defendants from the PIP coverage of the insureds. (*See* Compl. ¶¶ 75–219).  Further, these allegations are supported by claim-specific examples describing the who, what, when, where and how of the events at issue, including (i) a description of the fraudulent initial evaluations, which Defendants prepared them, when and for whom the fraudulent initial evaluations were made, as well as explanations of how the initial evaluations were fraudulent; (ii) a description of the unnecessary treatments given, which Defendants performed them, as well as explanations as to how those services were medically unnecessary; and (iii) a description of the services that were never performed, when and for whom fraudulent billing for services that were never performed were submitted, which Defendants submitted them, as well as testimony from patients indicating that those services were never performed.  (*See, e.g., id.* ¶¶ 91, 95, 121, 154, 158, 181 & 185 (detailing examples of fraudulent initial evaluations that were used to justify unnecessary treatments to patients); *id.* ¶¶ 106–12 (alleging that Defendants' billing statements document virtually every patient receiving the same unnecessary treatments regardless of the results of any initial evaluation purportedly performed); *id.* ¶¶ 134–45, 172–73, 199–200 (alleging and explaining that Defendants perform unnecessary injections on their patients based on fraudulent and predetermined testing which diagnoses virtually every patient with the same or

similar conditions); *id.* ¶¶ 113–14 & 146–47 (providing examples of Defendants' billing for services that were never performed)).  In fact, in connection with their Complaint, Plaintiffs submitted as exhibits, the fraudulent bills, supporting documentation, and treatment records that form the basis of their claims including the dates of service, and description of the contents of the submitted paperwork.  (*See, e.g.,* D.E. Nos. 1-1–1-24, Exs. A–X to Compl.); *Gov't Emps. Ins. Co. (GEICO) v. Korn*, 310 F.R.D. 125, 131 (D.N.J. 2015) (finding that complaint stated a claim under the IFPA and rejecting defendants' Rule 9(b) arguments where the complaint gave numerous specific examples of defendants' allegedly fraudulent conduct and attached as exhibits "voluminous spreadsheets, itemizing specific bills by provider, claim number, and date.").

And as to these allegations, Plaintiffs articulate facts to meet the three criteria of an IFPA claim.  Under the falsity prong, the Complaint contains extensive factual allegations detailing Defendants' (i) fraudulent initial evaluations that reported the same findings for all patients to justify a predetermined, non-individualized course of treatment that was unnecessary, regardless of the unique characteristics of each patient; (ii) unlawful billing for medically unnecessary services and misrepresentations regarding the medical necessity of services provided; and (iii) fraudulent billing for services that were never performed, all of which were designed to maximize compensation to the Defendants from the PIP coverage of the insureds.  (*See* Compl. ¶¶ 75–219).  As such, the Court finds that Plaintiffs have sufficiently alleged that Defendants presented false or misleading information in connection with submitting an insurance claim.  *See Va. Sur. Co*, 2011 WL 1769858, at *16 (finding that a complaint stating that the defendants "prepared a writing containing materially false statements . . . in order to support [their] insurance claims" was sufficient to state a claim under the IFPA.  Under the knowledge prong, Plaintiffs have sufficiently alleged that Defendants submitted bills and supporting documentation knowing that those

documents were false or contained material misrepresentations.  (*See* Compl. ¶¶ 291–92, 295 & 310).  Further, the aforementioned examples, if proven, would demonstrate that Defendants' billing for medically unnecessary services or services that were never performed was done as a matter of course, strongly indicating that Defendants knew of their fraudulent behavior when submitting PIP claims.  *See Elkholy*, 2022 WL 2373917, at *12 (finding that plaintiffs stated a claim under the IFPA where they set forth extensive examples of the types of services that were medically unnecessary and why those services were medically unnecessary, "strongly indicating that Defendants knew of their fraudulent behavior when submitting their PIP claims.").  Under the materiality prong, Plaintiffs have sufficiently alleged that the submitted information was material to a claim for reimbursement under an insurance policy.  The Complaint alleges that Defendants' false claims were material to Plaintiffs because Plaintiffs paid Defendants based on the claim forms submitted.  (*See* Compl. ¶¶ 5–6, 284–87); *see Focus Express Mail Pharmacy, Inc.*, 2017 WL 3588195, at *5 (finding that plaintiff alleged sufficient facts to establish that defendants' misstatements were material where complaint alleged that plaintiff paid defendants based on the claim forms submitted).

With respect to Plaintiffs' IFPA claim based on Defendants' alleged fraudulent treatment and billing protocols, Defendants contend that Plaintiffs' Complaint is insufficient to satisfy the heightened standard imposed by Rule 9(b) because it attempts to plead fraud "*en masse*" and "extrapolate from a few examples" the completely unsupported conclusion that all or most PIP benefits paid by Plaintiffs over the years were based on fraud.  (Mov. Br. at 15 (citing *MLS Med. Grp. LLC*, 2013 WL 6384652, at *8)).  The Court disagrees.  As explained above, the Complaint contains extensive factual allegations, supported by claim-specific examples, detailing Defendants' (i) fraudulent initial evaluations that reported the same findings for all patients to

justify a predetermined, non-individualized course of treatment that was unnecessary, regardless of the unique characteristics of each patient; (ii) fraudulent treatment protocols for unnecessary treatments with explanations as to why those services were medically unnecessary; and (iii) fraudulent billing for services that were never performed.  (*See* Compl. ¶¶ 75–219).  And the Complaint attaches as exhibits the fraudulent bills and supporting documentation that form the basis of their claims, including the dates of service and a description of the contents of the submitted paperwork.  (*See, e.g.,* D.E. Nos. 1-1–1-24, Exs. A–X to Compl.).  Other courts in this District have found that such a manner of pleading—namely, relying on examples that are detailed in nature and numerous in quantity—is sufficient for a claim under the IFPA to survive a motion to dismiss under Rule 9(b).  *See Elkholy*, 2022 WL 2373917, at *12; *see also Stelton Radiology Corp.*, 2022 WL 1486116, at *9 ("Such selected examples constitute sufficient support for the allegations; GEICO is not required to set forth the evidentiary particulars of each of the many allegedly false claims submitted in violation of the []IFPA at this . . . pleading stage."); *Korn*, 310 F.R.D. at 131.

    *Second*, Defendants contend that, though Plaintiffs allege that Defendants performed fraudulent initial evaluations, testing, and treatment, Plaintiffs fail to reveal to the Court that the treatment protocols followed by Defendants were mandated by Plaintiffs' own DPR Plan and the New Jersey PIP care paths, or medical protocols that set the standard for medically necessary treatment.  (Mov. Br. at 16–17).  However, Plaintiffs allege that Defendants performed unnecessary medical treatments on their patients.  (*See e.g.,* Compl. ¶¶ 134–45, 172–73 & 199–200 (alleging and explaining that Defendants perform unnecessary injections on their patients based on fraudulent and predetermined testing which diagnoses virtually every patient with the same or similar conditions)).  While Plaintiffs bear the burden of pleading their IFPA claim with

particularity, they do not bear the burden of rebutting Defendants' competing factual narrative, regarding whether the treatments they rendered were necessary. *Aetna, Inc. v. Open MRI & Imaging of Rochelle Park, P.A.*, No. 21-20043, 2022 WL 17176934, at *5 (D.N.J. Nov. 23, 2022) ("Resolving any dispute of fact at the motion to dismiss stage is inappropriate, as the [c]ourt must take [p]laintiffs' allegations as true and read the allegations in the light most favorable to [p]laintiffs."). As such, this argument is unavailing.

*Third*, Defendants argue that while the Complaint makes references to a handful of specific patients, those references are "merely a regurgitation of facts with no expert analysis, opinion, reference to statistically valid data related to patient complaints and findings, or any other reference to support even a prima facie case of fraud." (Mov. Br. at 17–19). The Court is not persuaded. While Plaintiffs IFPA claim may be subject to a heightened pleading standard, Plaintiffs are "not required to set forth the evidentiary particulars of each of the many allegedly false claims submitted in violation of the []IFPA at this . . . pleading stage." *Stelton Radiology Corp.*, 2022 WL 1486116, at *9. And Defendants have not directed the Court to any case law suggesting that expert analysis, opinion, or reference to statistically valid data related to patient complaints and findings is necessary to plead a claim under the IFPA.

*Fourth*, with respect to Plaintiffs' IFPA claim based on Defendants' improper self-referrals, Defendants argue that Plaintiffs have failed to allege with any specificity the when, how, where, or how much, as required under Rule 9(b) to support this claim. (Mov. Br. at 19). Specifically, Defendants argue that Plaintiffs merely allege that Dr. Marc Matturro and Dr. Robert Matturro own the building in which the doctors practice and collect rent from the doctors, without providing any specificity as to why this arrangement is fraudulent. (*Id.*). They state that there are no allegations that the rent is too high or fluctuates upon patient referrals, such that the Court could

infer that the rent payments are fraudulent. (*Id.*). Again, the Court disagrees. To start, the Complaint alleges that since at least January of 2014 and continuing through the present, Dr. Robert Matturro and Dr. Marc Matturro have improperly referred a significant portion of their patients to Advanced Spine, Bloomfield, and Primary Medical in exchange for kickbacks. (Compl. ¶¶ 80 & 266–82). Pursuant to this scheme, Advanced Spine, Bloomfield, and Primary Medical, allegedly gained access to Dr. Robert Matturro and Dr. Marc Matturro's offices by paying kickbacks to those doctors. (*Id.* ¶ 271). Plaintiffs allege that while the kickbacks were disguised as fees to "lease" office space, they were actually pay-to-play arrangements under which Dr. Robert Matturro and Dr. Marc Matturro would provide access to patients in return. (*Id.* ¶ 272). In fact, the Complaint alleges that the putative rent payments are not fixed fees set in advance and do not cover any regular lease term, but rather are set by the volume of patients that are referred by Dr. Robert Matturro and Dr. Marc Matturro to Advanced Spine, Bloomfield, and Primary Medical. (*Id.* ¶¶ 273–74). As such, contrary to Defendants' assertion, the Complaint alleges what fraud occurred, who was involved in the fraudulent scheme, the period during which the improper self-referrals and kickbacks occurred, how they were fraudulently structured, and where they took place. Such details are sufficient for injecting precision and some measure of substantiation into Plaintiffs' allegations of fraud. *Rolo*, 155 F.3d at 658.

And as to these allegations, Plaintiffs articulate facts to meet the three criteria of an IFPA claim. Under the falsity prong, the Complaint alleges that Defendants submitted fraudulent reports and bills, which falsely represented to Plaintiffs that they complied with pertinent healthcare laws and were eligible to receive PIP benefits, even though they were engaging in such improper self-referrals and kickbacks. (Compl. ¶¶ 42–44, 51–55 & 266–82). Under the knowledge prong, the Complaint contains allegations strongly indicating that Defendants knowingly orchestrated a

26

fraudulent scheme, "whereby Advanced Spine, Bloomfield and Primary Medical through Dr. Rosania agreed to pay kickbacks to Dr. Robert Matturro and Dr. Marc Matturro in exchange for patient referrals." (*Id.* ¶¶ 268 & 266–82). And in fact, "since New Jersey law stipulates that courts must presume medical providers are aware of all governing healthcare laws" Plaintiffs sufficiently allege that Defendants knew of their failure to disclose their noncompliance with relevant laws that prohibit the aforementioned improper self-referrals and kickbacks. *Elkholy*, 2022 WL 2373917, at *11 n.4 (citing *Allstate Ins. Co. v. Northfield Med. Ctr., P.C.*, 159 A.3d 412, 428 (N.J. Super. Ct. App. Div. 2017)); (*see* Compl. ¶¶ 279–82). And under the materiality prong, the Complaint alleges that those misrepresentations were material as they comprised the basis for reports and bills and induced Plaintiffs to pay out insurance benefits. (*See id.* ¶¶ 5–6 & 284–87). This is sufficient to support a violation of the IFPA.[8] *Gov't Emps. Ins. Co. v. Zuberi*, No. 15-4895, 2015 WL 5823025, at *5 (D.N.J. Oct. 1, 2015); *see also Gov't Emps. Ins. Co. v. Hamilton Health Care Ctr. P.C.*, No. 17-0674, 2018 WL 1226105, at *4 (D.N.J. Mar. 8, 2018) (finding that plaintiffs articulated facts to meet the criteria of an IFPA claim where plaintiffs alleged that defendants knowingly orchestrated a scheme to pay each other for referrals of patients, they submitted fraudulent forms and bills and their misrepresentations were material, as they comprised the basis for reports and bills and induced plaintiffs to pay out insurance benefits).[9]

---

[8]     To support their argument that Plaintiffs' allegations of a kickback scheme are conclusory, Defendants again cite to *MLS Med. Grp. LLC*, 2013 WL 6384652, at *11. (Mov. Br. at 19). The Court finds that *MLS* is distinguishable. In *MLS*, the court found that the plaintiffs' claim of a purported kickback scheme was conclusory where the amended complaint merely alleged that the defendants received patients through referrals and made lease payments to the referring providers that were disguised as kickbacks. *MLS Med. Grp. LLC*, 2013 WL 6384652, at *11. However, in *MLS* there was no indication that the complaint alleged—as it does here—that the rent payments were not fixed and instead fluctuated based on the volume of patients referred, supporting an inference that they operated as kickbacks. (Compl. ¶¶ 273–74). As such, Plaintiffs have done more than simply attach a kickback label to the referral fees or lease payments. Accordingly, *MLS* is inapposite.

[9]     To the extent that Defendants challenge Plaintiffs' IFPA claim based on Defendants' illegal corporate structure (Mov. Br. at 15), that argument similarly fails. To start, the Complaint alleges that at various times between 2009 and the present Defendants Advanced Spine, Bloomfield, and Primary Medical were illegally owned and controlled by Defendant, Dr. Rosania, a chiropractor, despite the fact that New Jersey law prohibits chiropractors from

*Fifth*, Defendants argue that Plaintiffs have not alleged what misrepresentations each doctor allegedly made or the basis for the knowledge that the representation was false.  (Mov. Br. at 20).  The Court disagrees.  The Complaint contains extensive allegations, supported by claim-specific examples, detailing what misrepresentations each doctor allegedly made.  (*See, e.g.,* Compl. ¶¶ 91, 95 & 114 (offering examples of fraudulent initial evaluations that were used to justify unnecessary treatments to patients as well as bills submitted by Dr. Robert Matturro and Dr. Marc Matturro for services that were never performed); *id.* ¶¶ 116–17, 121 & 134–43 (providing examples of fraudulent initial evaluations and reports that were prepared by Advanced Spine under the control and supervision of Dr. Dhillon and Dr. Rosania that were used to justify unnecessary treatments to patients); *id.* ¶¶ 146–47 (detailing examples where Dr. Dhillon and Dr. Rosania billed Plaintiffs for services that were not performed); *id.* ¶¶ 149–50, 154 & 158 (providing examples of fraudulent initial evaluations and reports that were prepared by Bloomfield under the control and supervision of Dr. Rand and Dr. Rosania that were used to justify unnecessary treatments to patients); *id.* ¶¶ 175–79, 181 & 185 (offering examples of fraudulent initial evaluations and reports that were prepared by Primary Medical operated by Dr. Citarelli and Dr. Rosania that were used to justify unnecessary treatments to patients); *id.* ¶¶ 205–12 & 218

---

employing physicians or owning healthcare practices that provide medical diagnostic tests.  (Compl. ¶¶ 220–65).  As such, the Complaint alleges what fraud occurred, who was involved in the fraudulent scheme, the period during which the improper corporate structure existed, and where the fraud took place.  And as to these allegations, Plaintiffs articulate facts to meet the three criteria of an IFPA claim.  Under the falsity prong, the Complaint alleges that Defendants submitted fraudulent reports and bills, which falsely represented to Plaintiffs that they complied with pertinent healthcare laws and were eligible to receive PIP benefits, even though they had an illegal corporate structure.  (*Id.* ¶¶ 235–38, 249–51 & 263–65).  Under the knowledge prong, the Complaint contains allegations indicating that Defendants knowingly orchestrated a fraudulent scheme to recover PIP benefits they were not entitled to receive based on their corporate structure.  (*Id.* ¶¶ 223–24, 239 & 253).  And in fact, "since New Jersey law stipulates that courts must presume medical providers are aware of all governing healthcare laws" Plaintiffs sufficiently allege that Defendants knew of their failure to disclose their noncompliance with relevant laws that prohibit the aforementioned corporate structure.  *Elkholy*, 2022 WL 2373917, at *11 n.4 (citing *Allstate Ins. Co..*, 159 A.3d at 428).  And under the materiality prong, the Complaint alleges that those misrepresentations were material as they comprised the basis for reports and bills and induced Plaintiffs to pay out insurance benefits.  (*See id.* ¶¶ 5–6, 235–38, 249–51, 263–65 & 284–87).  This is sufficient to support a violation of the IFPA.

(detailing examples of fraudulent initial evaluations and reports that were prepared by Dr. Tartaglia that were used to justify unnecessary treatments to patients as well as unnecessary over-prescription of pain medications); *id.* ¶¶ 220–65 (detailing how Dr. Rosania enlisted Dr. Dhillon, Dr. Rand and Dr. Citarelli to open medical practices that would be unlawfully controlled and directed by Dr. Rosania and engaged in fraudulent services not eligible for PIP reimbursement); *id.* ¶¶ 266–82 (alleging that Dr. Dhillon, Dr. Rand, and Dr. Citarelli through Dr. Rosania entered into arrangement with Dr. Marc Matturro and Dr. Robert Matturro whereby Dr. Marc Matturro and Dr. Robert Matturro would provide patient referrals to the other doctors in exchange for kickbacks)). Further, the Complaint adequately alleges the basis for these doctors' knowledge that the representations were false. Specifically, Plaintiffs have alleged that Defendants knowingly submitted bills and supporting documentation that were false or contained material misrepresentations. (*See id.* ¶¶ 291–92, 295 & 310). And the aforementioned examples, if proven, would demonstrate that the doctors' billing for medically unnecessary services or services that were never performed was done as a matter of course, strongly indicating that they knew of their fraudulent behavior when submitting PIP claims. *See Elkholy*, 2022 WL 2373917, at *12. Further, as stated above, "since New Jersey law stipulates that courts must presume medical providers are aware of all governing healthcare laws" Plaintiffs sufficiently allege that the doctors' knew of their failure to disclose their noncompliance with relevant laws that prohibit an unlawful corporate structure and self-referrals and kickbacks. *Id.* at *11 n.4 (citing *Allstate Ins. Co.*, 159 A.3d at 428). As such, the Court finds Defendants' argument unavailing.[10]

### C.    Count V

---

[10]    And while Defendants contend that many of the named Defendants had no involvement with processing, submitting, reviewing or collecting on the claims (Mov. Br. at 8), this presents the Court with a competing factual narrative that cannot be resolved at this procedural posture. *Aetna, Inc.*, 2022 WL 17176934, at *5. As such, the Court does not reach the issue.

In Count V, Plaintiffs seek a declaration pursuant to the Declaratory Judgment Act that they have (i) no legal or equitable obligation to issue reimbursement to Defendants on any outstanding or unpaid claims for payment based on any treatment records submitted prior to the commencement of this action and (ii) no legal or equitable obligation to issue reimbursement to Defendants for any treatment records submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations. (Compl. at 79). Defendants move to dismiss Count V under Rule 12(b)(1) because they contend that this claim is subject to arbitration. (Mov. Br. at 11–14). Count V is dismissed for the following reasons.

First, to the extent that Plaintiffs seek a declaration that Defendants committed common law fraud, aided and abetted that fraud, or are liable for unjust enrichment, "an arbitrator shall decide that issue." *See Elkholy*, 2022 WL 2373917, at *12; *Caring Pain Mgmt. PC*, 2023 WL 3749984, at *8.

Second, the Court "possess[es] discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls* Co., 515 U.S. 277, 282 (1995) (citation omitted). Courts may exercise that discretion and dismiss declaratory judgment claims where the judgment sought is "duplicative or redundant of other claims." *Elkholy*, 2022 WL 2373917, at *12 (internal quotation marks and citation omitted). Because the Court will not dismiss Plaintiffs' IFPA claim and thus will determine whether Defendants violated the IFPA, the Court declines to "make a duplicitous finding on the same issue under the guise of a declaratory judgment action." *Id.* (citations omitted); *see also Maniscalco v. Brother Intern. Corp. (USA),* 627 F.Supp.2d 494, 504–05 (D.N.J. 2009) (dismissing declaratory judgment claim where the declaration sought would

be duplicative of a favorable finding on their other claim); *AV Design Servs., LLC v. Durant*, No. 19-8688, 2021 WL 1186842, at *12–13 (D.N.J. Mar. 30, 2021) (dismissing declaratory judgment claim where claim was "entirely duplicative of . . . breach of contract claim").  As such, Count V is DISMISSED *without prejudice*.

## IV.    CONCLUSION

Based on the foregoing, Defendants' motion (D.E. No. 9) is **GRANTED-in-part** and **DENIED-in-part**.  An appropriate Order accompanies this Opinion.

Dated: July 6, 2023                                          *s/ Esther Salas*
                                                             **Esther Salas, U.S.D.J.**